KLEESON COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 7050, 19116.    Promulgated April 30, 1927.

Where a corporation acquired without cost in 1919 a contract for the hire of convict labor, *held*, that the value, if any, of such contract may not be included in invested capital. *Held, further*, that the evidence does not warrant a finding that the contract had a value at the date of acquisition, the exhaustion of which may be spread over the life of the contract and an aliquot part of which may be deducted from gross income in income-tax returns.

*Robert McNeill, Esq.*, and *James A. Councilor, Esq.*, for the petitioner.
*W. F. Gibbs, Esq.*, for the respondent.

This is a proceeding for the redetermination of deficiencies in income and profits tax for the fiscal years ended April 30, 1920, 1921, and 1922 in the respective amounts of $21,874.38, $4,800.13, and $14,-050.51. The appeal entered under Docket No. 7050 relates to the years 1920 and 1921, and the appeal entered under Docket No. 19116 relates to the year 1922. The issues in each appeal being identical, the appeals were consolidated for the purpose of this proceeding. The petitioner alleges that the Commissioner erred in not including in its invested capital for each of the years involved $150,000 as the value of a contract under which it operated and in not allowing as a deduction from gross income for each of the years involved an aliquot part of the value of said contract representing exhaustion thereof.

### FINDINGS OF FACT.

John A. Bloyd, a resident of Moundsville, W. Va., was from 1897 to 1913, one of the managing directors of the penitentiary in Mounds-

ville. The board of directors consisted of five individuals appointed by the Governor. Bloyd was resident director and treasurer of the penitentiary. As such director he had much to do with the letting of contracts for the employment of convicts in the penitentiary during his term of office. During such term three contracts similar to the one mentioned below were let and were renewed at the end of each five years. One was the J. C. Bardol contract, one the Kraft Manufacturing Co. contract, and the other the Joseph Klee's Sons contract. Two of these were in existence at the time Bloyd became managing director, and one, the Kraft contract, was let by him and his associates. These contracts were let to the highest bidders after due advertisement had been made. The renewals were also made upon bids received in response to advertisements. Under the Bardol contract the pay for the convict labor hire was originally 62 cents per day and was increased until in 1919 it was 90 cents per day. The price paid for convict labor under the other two contracts ranged from 52 or 55 cents to 72 cents per day. The Klee's Sons contract or renewals thereof had been in effect for about 25 years prior to 1919. This contract called for the employment of 200 convicts in a pants factory located in the penitentiary grounds. In 1913, 62 cents per day for convict labor was paid under this contract. In 1913 the letting of the contracts was taken over by the State Board of Control, which was then given charge of all the penal and eleemosynary institutions of the State.

The so-called Klee's Sons contract was let to two brothers, the sons of Joseph Klee, one of whom lived in New York and one at Wheeling, W. Va. These brothers had married wealthy women and were reputed to have accumulated a considerable fortune from the operation of the prison contract. They desired to retire from the business in 1919, at which time their then contract had two years to run. They had been closely associated with Bloyd for a number of years and offered to sell their contract to him provided he would pay them $10,000 for machinery and equipment and pay the invoice price of the merchandise on hand, and provided he would permit M. Bachenheimer, who had been the manager of the factory and had been in their employ for a period of 20 years, to acquire an interest in the business and be continued in employment. Bloyd learned from the State Board of Control that it would be willing that he should be substituted for the Klee brothers as contractor and would be willing to execute a new contract for a period of five years on approximately the same terms as the contract then held by the Klee sons. The State Board of Control was not required to advertise for bids before the contract was let. If in their opinion the letting of the contract was for the best interests of the State the same could be entered into. Bloyd knew the intimate workings of the different

contracts for the employment of convict labor and he believed that the contract could be operated profitably.

On March 26, 1919, the State Board of Control, party of the first part, entered into an agreement with J. A. Bloyd and Marcus Bachenheimer, parties of the second part, whereby the party of the first part agreed on behalf of the State to furnish the parties of the second part certain convict labor at a stipulated per diem hire for the purpose of operating the pants factory within the state penitentiary at Moundsville. The parties of the second part were also to have the use of certain factory buildings on the premises rent free in which the work was to be performed. The contract was to run for a period of five years beginning July 1, 1919. Material parts thereof read as follows:

THIS AGREEMENT, Made and entered into this 26th day of March, 1919, by and between the State Board of Control of West Virginia, a corporation, party of the first part, hereinafter called "State Board of Control", and John A. Bloyd and M. Bachenheimer, parties of the second part, hereinafter called "Contractors."

WITNESSETH, That for and in consideration of the covenants and agreements of the Contractors, hereinafter contained, the State Board of Control hereby agrees to hire and let to the Contractors for the term of five years from and including the first day of July 1919, the labor and services of two hundred (200) male convicts in the West Virginia Penitentiary, with the privilege of as many more as may mutually be agreed upon, such men to be what are generally denominated able bodied men, who shall then or may thereafter be confined in the said Penitentiary, to be employed by the Contractor in the manufacture of pantaloons, overalls, and other articles of men's clothing, except shirts and underwear.

And the said party of the first part hereby covenants with the Contractors, not to permit any other contract for the same kind of business within the Penitentiary during the life of this contract.

For the purpose of carrying on the business herein named the Contractors shall have and be permitted to occupy all of the shop room that is now being used by the Joseph Klee's Sons Company, * * * and the said Contractors agree to pay to the State Board of Control for fire protection $500.00 per year, or $41.66⅔ per month, to be paid monthly as above provided for payment of electricity.

*       *       *       *       *       *       *

The daily tasks to be performed by the convicts is to be fixed by the Warden and the Contractors by mutual agreement, subject to confirmation by the State Board of Control. The Contractors agree to pay for all overtime done by any convict at the same rate per day as that paid for the daily task of the convicts; and to pay for said overtime monthly in cash to the Warden on or before the tenth day of the month following that in which the work is done. * * *

It is further understood and agreed between the parties hereto that the Contractors are to pay the sum of seventy-two cents (72¢) per day for each convict so employed under this agreement, payments for said labor to be made on or before the tenth day of each month for the previous month's labor, and in the form and manner as prescribed by law.

If for any cause there should be a deficiency in the number of convicts available for labor, and thereby the State Board of Control should be unable to fur-

nish the Contractors with the labor of the full number of convicts called for herein, then the Contractors shall accept the same proportion of the whole number hereinbefore specified as may be furnished other contractors employing convict labor in said Penitentiary, and in such event the Contractors shall pay for the labor of only such convicts as are actually employed by it, but shall not be entitled to any damages or other compensations on account of such deficiency.

It is understood and agreed that should the National Government pass laws inimical to the sale of prison made goods to such an extent as to make unlawful the sale of goods manufactured under this contract, or should a majority of the following states pass such laws, namely; Massachusetts, New York, New Jersey, Pennsylvania, Ohio, Indiana, Illinois, Maryland, Texas, California, Michigan, Missouri, and West Virginia, then the Contractors may cancel this contract by giving sixty (60) days notice in writing of its intention so to do to the State Board of Control.

The Contractors have filed with the State Board of Control, their bond in the penalty of Twenty Thousand Dollars ($20,000.00) conditioned for the faithful performance of its duties hereunder, and the payment to the State Board of Control of all money due under the provisions hereof.

Bloyd and Bachenheimer originally intended to operate the business by themselves, believing that the capital which they had, approximately $100,000, was sufficient therefor. After the contract had been secured, however, they found that their capital was inadequate and that the business would require a capital of at least $200,-000. Accordingly, it was decided to incorporate a company, the petitioner, for the purpose of taking over and operating under the above described contract. The petitioner was incorporated on August 16, 1919, with an authorized capital of $300,000 of which amount it was contemplated that $200,000 should be immediately paid in. Bloyd was elected president and has been president of the corporation ever since. Bloyd and Bachenheimer subscribed for slightly less than one-half of the total stock. Business friends of Bloyd subscribed for the balance of $200,000 stock being induced thereto by the statement of Bloyd that in his opinion the contract itself had a value over and above the amount to be paid to the Klee brothers for machinery and merchandise of $150,000.

On or about April 22, 1919, a meeting of the stockholders of the corporation was called at which the corporation agreed to accept from Bloyd and Bachenheimer an " assignment of an agreement made by them with the State Board of Control of West Virginia, dated March 26, 1919, for the hire and let of the labor of 200 convicts, with other rights and privileges, and for the compensation therein fixed, and that the company assume the obligations and duties therein imposed by John A. Bloyd and Marcus Bachenheimer in their place and stead, and that the president be and hereby is authorized to execute on behalf of this company a contract bearing the date of the 26th day of March, 1919, with the State Board of

Control of West Virginia, for the hire and let of the labor of 200 convicts, with the same other rights and privileges and for the same compensation as provided in the above agreement."

On May 1, 1919, the State Board of Control entered into a contract of like tenor and effect as the contract entered into with Bloyd and Bachenheimer on March 26, 1919, in which the Kleeson Company was named as party of the second part in place of J. A. Bloyd and M. Bachenheimer.

Under the contract no rental was chargeable to the petitioner for the use of the factory buildings which it occupied on and after July 1, 1919. The two buildings mentioned in the contract were furnished petitioner free of rent. They were of brick construction about 40 feet wide by 200 feet long and occupied for factory purposes. One was a three-story building with a central heating and lighting plant occupying one end of the ground floor. The buildings were kept in repair and heated without cost to the contractor but the petitioner was charged for the electricity used.

In addition to the stipulated amount of 72 cents per day which was to be paid to the State for the services of each convict, the petitioner also paid to the individual convicts a bonus computed on a piece work basis for all work performed over a specified quantity, known as "the task." During the years 1920 to 1924, inclusive, the petitioner, operating under the contract, paid to the State and to the individual convicts the following amounts:

| Year. | To State. | To convicts. |
|-------|-----------|--------------|
| 1920 | $41, 435. 77 | $20, 406. 86 |
| 1921 | 43, 593. 76 | 15, 748. 67 |
| 1922 | 71, 771. 48 | 18, 271. 43 |
| 1923 | 84, 160. 72 | 23, 559. 68 |
| 1924 | 89, 994. 79 | 30, 388. 07 |
| | 330, 956. 52 | 108, 374. 71 |

The average total paid to each convict was approximately 95.5 cents per day. The average minimum hire for free labor of approximately equal value would have been about $2 per day.

During the same period, the petitioner operated another pants factory in the City of Moundsville, in conjunction with the one within the penitentiary, using free female labor. On a comparative basis, the production per person was substantially higher in the prison factory than in the outside factory. The cost of labor in the outside factory per unit of production was approximately double that in the prison factory.

The net income and net tangible investment, exclusive of the contract here in question, of the Kleeson Company for the five years covered by the contract were as follows:

| Year. | Net income. | Investment, beginning of year. |
|---|---|---|
| 1920 | $103, 137. 47 | $222, 033. 85 |
| 1921 | 38, 917. 91 | 337, 749. 79 |
| 1922 | 109, 857. 44 | 323, 942. 33 |
| 1923 | 197, 450. 75 | 395, 076. 85 |
| 1924 | 187, 023. 56 | 529, 573. 45 |
| Total | 636, 387. 13 | 1, 808, 376. 27 |
| Average | 127, 277. 43 | 361, 675. 25 |

In the year 1923 one Isadore Gordon, who had a similar contract with the State Board of Control (formerly the Kraft Manufacturing Co. contract) calling for the hire of 400 male and female convicts; sold his contract, then having a remaining life of four years, together with the entire business for the sum of $200,000. Of this amount $125,000 was paid in cash, $25,000 by note, and $50,000 in stock of the purchasing company. Under this contract Gordon was manufacturing shirts for a New York company which furnished the material and paid a stipulated price per dozen for the manufacturing.

OPINION.

SMITH: The issues to be considered are (1) whether the value, if any, of the contract above described may be included in the petitioner's invested capital; (2) what amount, if any, of such value representing exhaustion thereof, may be deducted from income for each of the years involved; and (3) the actual cash value of the contract at the time acquired by the petitioner.

The petitioner contends specifically (1) that the total value of the contract should be included in invested capital as representing tangible property; or in the alternative, (2) that the value of the leasehold contained in the contract should be included in invested capital as tangible property in an amount equal to the total value claimed for the contract; (3) that the contract had a fair market value when acquired of at least $150,000; (4) that the entire value of the contract should be exhausted ratably over the five years of its life.

The statutory definition of invested capital is found in section 326 of the Revenue Act of 1918, which reads as follows:

SEC. 326. (a) That as used in this title the term "invested capital" for any year means (except as provided in subdivisions (b) and (c) of this section):

(1) Actual cash bona fide paid in for stock or shares;

(2) Actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment, but in no case to exceed the par value of the original stock or shares specifically issued therefor, unless the actual cash value of such tangible property at the time paid in is shown to the satisfaction of the Commissioner to have been clearly and substantially in excess of such par value, in which case such excess shall be treated as paid-in surplus: *Provided*, That the Commissioner shall keep a record of all cases in which tangible property is included in invested capital at a value in excess of the stock or shares issued therefor, containing the name and address of each taxpayer, the business in which engaged, the amount of invested capital and net income shown by the return, the value of the tangible property at the time paid in, the par value of the stock or shares specifically issued therefor, and the amount included under this paragraph as paid-in surplus. The Commissioner shall furnish a copy of such record and other detailed information with respect to such cases when required by resolution of either House of Congress, without regard to the restrictions contained in section 257;

(3) Paid-in or earned surplus and undivided profits; not including surplus and undivided profits earned during the year;

(4) Intangible property bona fide paid in for stock or shares prior to March 3, 1917, in an amount not exceeding (a) the actual cash value of such property at the time paid in, (b) the par value of the stock or shares issued therefor, or (c) in the aggregate 25 per centum of the par value of the total stock or shares of the corporation outstanding on March 3, 1917, whichever is lowest;

(5) Intangible property bona fide paid in for stock or shares on or after March 3, 1917, in an amount not exceeding (a) the actual cash value of such property at the time paid in, (b) the par value of the stock or shares issued therefor, or (c) in the aggregate 25 per centum of the par value of the total stock or shares of the corporation outstanding at the beginning of the taxable year, whichever is lowest: *Provided*, That in no case shall the total amount included under paragraphs (4) and (5) exceed in the aggregate 25 per centum of the par value of the total stock or shares of the corporation outstanding at the beginning of the taxable year * * *.

Since the contract here in question was acquired by the petitioner as a gift, the question of whether its value in any amount may be included in invested capital as intangible property comes squarely within our ruling in the *Appeal of Herald-Despatch Co.*, 4 B. T. A. 1096, and must therefore be decided adversely to the contentions of the petitioner.

The 1918 Act defines intangible property and tangible property as follows:

The term " intangible property " means patents, copyrights, secret processes and formulae, good will, trade-marks, trade-brands, franchises, and other like property;

The term " tangible property " means stocks, bonds, notes, and other evidences of indebtedness, bills and accounts receivable, leaseholds, and other property other than intangible property.   [Sec. 325. (a).]

It is not clear to us that contracts generally are so like or unlike the properties enumerated as intangible property and tangible prop-

erty as to fall very readily into either class. We may conjecture that because of their divergency of character contracts were considered incapable of satisfactory classification. It is stated in the Commissioner's Regulations 45, article 811, that a contract should be treated as intangible property unless it is shown that it relates to rights in tangible property to such an extent that its value arises chiefly therefrom. If the contract here had been simply for the hire of convict labor, we would have no difficulty in finding that it was intangible property. There is certainly no element of tangibility in unperformed labor. We are asked to find, however, that the leasehold embodied in the contract had itself a value in excess of the value claimed for the entire contract. We are unable to arrive at this conclusion. The evidence as well as the construction of the contract itself indicates that the convict labor was the chief element of value. Since the work could not be performed without the confines of the penitentiary, it was a matter of necessity that the use of the buildings be offered for factory purposes as an inducement for bids for the convict labor. The buildings would of course have had no value apart from the convict labor; so that whatever value the leasehold in itself may have had, it was a part of and indistinguishable from the value of the labor feature of the contract.

It is now well recognized that under section 234(a)(7) of the 1918 Act, deductions may be taken by a corporation for exhaustion of contracts and like property where the cost or the March 1, 1913, value of such property constituted capital of the corporation. *Kaufman-Straus Co.* v. *Lucas*, 12 Fed. (2d) 774; *Appeal of Atlantic Carton Corporation*, 2 B. T. A. 380; *Appeal of General Equipment Co.*, 2 B. T. A. 804; *Appeal of Automatic Fire Protection Co.*, 3 B. T. A. 1267; and *Appeal of National Film Publicity Co.*, 4 B. T. A. 118. In *Appeal of J. M. Browning*, 6 B. T. A. 914, we allowed a deduction for the exhaustion of intangibles paid in without cost, or at a nominal cost of $1, on the basis of their proved value at the date acquired by the corporation. Under that decision the contract here in question should be exhausted over the period of its life at its actual value when acquired by the petitioner.

The petitioner claims that the value of the contract set up on its books at date of organization at $150,000 was understated; that the true value more nearly approximated $450,000. It asks us to determine the value of the contract and to permit the deduction from the gross income of each of the taxable years of an aliquot part of such value.

The evidence indicates that the contract was a fair contract as between the State and the contractor for the employment of convict labor. The petitioner was paying as much for the labor of its convicts as was paid by other contractors of convict labor at Mounds-

ville, with the exception of the Bardol contract where, by reason of the character of the work and for other reasons, a larger per diem amount was paid. The petitioner was paying as much as was paid for convict labor under the Gordon contract and it appears that upon a renewal of the Gordon contract by the Reliance Manufacturing Co., a smaller per diem was paid for convict labor. Bloyd was clearly of the opinion that the contract had a very great value. He believed that it could be operated profitably. He told his business associates that in his judgment the contract had a value to the Kleeson Company of $150,000. The basis for this value was testified to by him as follows:

There are very few outside people who would know anything about prison contracts. I mean outside business people. There are only a few of them and people don't know. But from the time I served on the Board there, I studied the conditions of those contracts, studied them, and I became acquainted with the value of them, and after the Klee people decided to move to New York, there came conditions there they thought, on account of legislation and one thing and another, that their contract might not be so valuable, but those things changed around. Then, another thing; the last few years they did not manage their factory economically. They were wasting thousands a year there in trimmings that ought not to be wasted. They had twice as many outside—what we call free help—as they would have to have. I knew that from the conditions. I told our people that when I took over the contract that I would eliminate $1,000 a month on this outside help, which I did. As soon as I took over the contract I went to work and cut off just $12,000 a year there; and I went out in the trimming department, where they were using so much more trimming than was necessary, and the first year, well, not the first year, but it was in a couple of years only—we eliminated a waste of over $27,000, and those things I knew.

As we stated in *Rockford Malleable Iron Works*, 2 B. T. A. 817, "Value is what the property is worth. It is what it would bring in the open market if offered for sale by an owner willing, but not compelled, to sell to a purchaser willing, but not compelled, to buy."

The petitioner claims that by virtue of the contract it had the use of the prison buildings free of rent, the rental of which was worth $30,000 per year. This, however, appears to be a characteristic of all contracts for the employment of convict labor. That was only one of the elements that made it profitable for persons to bid for the employment of convict labor.

The petitioner also claims that the sale of the Gordon contract in 1923, calling for the employment of 400 male and female convicts for a price of $200,000 serves to establish a value for a contract of the character of that possessed by the petitioner. We think, however, that the sale of that contract in 1923, without more information than is contained in the record, furnishes little evidence of the value of the Klee's Sons contract in 1919. In our opinion the evidence does not warrant a finding that the contract acquired by Bloyd and Bachenheimer from the State Board of Control on March 26, 1919,

and turned over to the petitioner as a gift to it had a value (in excess of the amount paid by Bloyd and Bachenheimer for machinery and merchandise to the Klee brothers) which may be the basis of a deduction for exhaustion in the tax returns of the petitioner for the years 1920, 1921, and 1922.

*Judgment will be entered for the respondent.*

MURDOCK and GREEN dissenting: We can not agree with that portion of the prevailing opinion which holds that the evidence does not warrant a finding that the contract had any value when turned over to the corporation by Bloyd and Bachenheimer. In 1919, these contracts for prison labor were no longer let upon competitive bids and there is nothing in the evidence which would preclude a finding that this contract had a value. On the contrary the findings of fact clearly indicate to our minds that the contract had a substantial value, which amounted to $150,000 at least.